**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KPX, L.L.C., an Arizona limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>Transgroup Worldwide Logistics, Inc., a Washington corporation; Transgroup Express, Inc., a Washington corporation,<br><br>    Defendants. | CV 04-352 TUC DCB<br><br>**AMENDED ORDER** |

Plaintiff, KPX, L.L.C. (KPX), filed this action in state court on May 27, 2004. Defendant, Transgroup Worldwide Logistics, Inc./Transgroup Express, Inc. (Transgroup), removed it to this Court on July 2, 2004, based on 28 U.S.C. §§ 1441(c), 1443, and 1446. Plaintiff's claim in Count I alleges a violation of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706. Count II alleges breach of contract. Count III alleges a private cause of action pursuant to 49 U.S.C. § 14704 for violations of the Interstate Commerce Act, 49 U.S.C. § 14706. KPX seeks damages in the amount of $7,946.00.[1]

Plaintiff alleges that Transgroup, a freight forwarder, contracted with a motor carrier to transport Plaintiff's goods via highway transport in interstate commerce, and the motor carrier failed to deliver a portion of the shipment. The Court lacks original jurisdiction over the Carmack Amendment claim because the amount in controversy under the bill of lading does not exceed $10,000.00 (See 28 U.S. C. § 1337(a) (jurisdiction in federal court arise if the matter

---

[1](Plaintiff's Motion for Summary Judgment at 5; SOF at ¶¶ 17-18.)

Dockets.Justia.com

in controversy for each receipt or bill of lading exceeds $10,000.00 excluding interest and cost). The amount in controversy also prevents this Court from having diversity jurisdiction over the breach of contract claim. There is, however, federal question jurisdiction pursuant to § 49 U.S.C. § 14704(a)(2) and (e), which provides a private cause of action for damages caused by violations by freight forwarders and brokers of the Interstate Commerce Act (ICA), Motor Carrier provisions. Plaintiff alleges that Defendant operates in violation of the ICA because it masquerades as an exempt airfreight forwarder without meeting the requisites therefore, and for the sole purpose of limiting liability to $.50 per pound. KPX claims that it is entitled to $25 per pound for its lost goods.

The parties have filed crossmotions for summary judgement. Court finds for KPX, grants its Motion for Summary Judgment, and awards damages as requested by KPX.

## STATEMENT OF CASE[2]

KPX arranged for the transportation of nine skids containing 170 boxes of electric scooters weighing 9,000 pounds through a freight broker, Road-e-o Freight Systems (Road-e-o), who contacted Transgroup, a freight forwarder, to transport the 170 electric scooters. Transgroup hired Value Truck to transport the scooters from KPX to Cobra Motors in Sugarland, Texas. (Transgroup SOF at 4 (citing Third-party Complaint at ¶ 8).[3] In addition to the suit between KPX and Transgroup, Road-e-o is sued by Transgroup in a Third-party Complaint.[4]

---

[2]The facts stated herein without citation to the record are undisputed.

[3]*But see*: Transgroup hired Benchmark Express (Benchmark) to transport the scooters. (Transgroup SOF at Ex. C (Transgroup's bill of lading showing Value Truck as delivering scooters to Benchmark); Transgroup Response, SOF at ¶ 4, 8, 11 (admitting it hired Benchmark and it was a Benchmark driver that picked up the scooters from KPX); KPX SOF ¶ 4, Ex. B: Nicolls Affidavit (he was told by Transgroup that it contracted with Benchmark Express to transport the scooters).

[4]Transgroup sued Road-e-o freight in a third-party Complaint on August 5, 2004. Transgroup seeks total indemnification from Road-e-o, in the event the Court finds it liable for damages to KPX. Road-e-o counterclaims that Transgroup hired a motor carrier, Value Truck, Inc., that is not licensed or registered, and as a result of Transgroup's negligent hiring Value Truck and corresponding failure to deliver the KPX shipment, KPX stopped utilizing Road-e-o's brokerage service, resulting in financial loss

Prior to contacting Transgroup on behalf of KPX, Road-e-o had been calling upon Transgroup for trucks to haul its customers' freight from Tucson to interstate destinations. It was Road-e-o's practice to type-up the shipping information on its own straight bill of lading for presentation to the driver sent by Transgroup as the governing bill of lading. In this way, Road-e-o insured that the drivers received instruction for delivery to the proper consignees and that the carriers would send the freight bills to Road-e-o. The driver signed Road-e-o's bill of lading and Transgroup returned it to Road-e-o. The front page of the Road-e-o bill of lading clearly limits the carrier's liability to $25 per pound. (KPX Supplemental SOF: Nicolls Affidavit.)

Road-e-o followed this practice on behalf of KPX. It prepared and provided a straight bill of lading to KPX to use in shipping the scooters. Road-e-o informed Transgroup that the bill of lading was completed and that the nine skids, 9000 pounds, was ready and waiting for pick-up and delivery. (KPX SOF, at Ex. K: April 22, 2003 memo to Transgroup.) On April 22, 2003, Value Truck arrived at KPX to pick up the scooters. On behalf of Transgroup, Value Truck took possession of the scooters. The truck driver signed the bill of lading prepared by Road-e-o. (KPX SOF at Ex. C: Road-e-o Straight Bill of Lading signed 4/22/03.) At the truck driver's request, KPX signed a document that Transgroup alleges is its bill of lading, which contained a liability limitation of $.50 per pound. (Transgroup at Ex. A.) Unlike the Road-e-o straight bill of lading, the Transgroup document is not so captioned, and KPX argues that it is an illegitimate airbill.

Transgroup asserts that before April, 2003, it and Road-e-o had an established course of dealing that extended over 6 to 7 months, which involved daily communication and daily placement of shipping orders. Road-e-o utilized Transgroup as a freight forwarder and/or carrier on dozens, if not hundreds of occasions, and on those occasions, Transgroup used the

---

to Road-e-o in excess of $500 per month since April of 2003. (Answer and Counterclaim at ¶¶ 9-13.) This Order does not dispose of the claims between Transgroup and Road-e-o. The third-party Complaint remains.

identical bill of lading challenged here by KPX, including the language limiting its liability to $.50. (Transgroup at Ex. D: Wickstrom Affidavit.)

Transgroup's challenged document has a small box in the top right hand corner labeled "Airbill No.," which was filled out by Transgroup with an airbill number: "41A310135." Transgroup's alleged bill of lading included numerous airfreight references, such as: "NFO (next flight out)" and "Shipper must sign this bill and produce the proper identification. One type of photo ID is acceptable if issued by employer or government. If IDs cannot be furnished, the FAA requires 2 forms of ID, one of which must be government issued, non-photo."[5] Included as a place where Transgroup receives goods is: "airport terminal." The back of the document states "this airbill is non-negotiable;" "Transgroup House Airwaybill;" "airport terminal" delivery and "perils of the air" is listed as an exclusion from liability. (KPX SOF at Ex. D: Transgroup document.)

The express language in Transgroup's alleged bill of lading/airbill limiting its liability to the maximum sum of $.50 per pound includes an exclusion: "unless otherwise noted as insured or declared value" on the bill of lading. (Transgroup's SOF at ¶ 7.) The same is set forth in the Terms and Conditions on the reverse side of the bill of lading. *Id.* at ¶ 8. The face of the document contains two blank boxes for the insertion of an "Insured Value" and/or a "Declared Value." *Id.* at ¶ 9. KPX did not fill in either the "Insured Value" or the "Declared Value" boxes. *Id.* at ¶ 10. The shipper's signature block is located just below the insured and declared value boxes, which could have been used by KPX to declare liability for the full value of the scooters. *Id.* at ¶ 11.

The signature block where KPX signed the document included the following language: "I certify that this shipment does not contain any unauthorized explosives, destructive devices, or hazardous materials. I consent to a search of this cargo. I am aware that this endorsement and original signature, along with other shipping documents will be retained [] for at least thirty

---

[5]The copies of this document are exceedingly poor which explains any discrepancy between this Court's quotes and the words in the document.

(30) days." (Transgroup SOF at Ex. A.) In an adjacent block, the following language appeared: "By signing, shipper acknowledges and accepts the terms and conditions of contract as stated on the reverse and agrees to be bound thereby." *Id.*

After the driver signed the Road-e-o bill of lading, he asked KPX to sign the Transgroup document. (KPX SOF at ¶ 11.) He did not explain its contents, its purpose, or mention the limitation of liability contained therein or any other available rates. *Id.* at ¶ 12; Ex. A: Kanko Affidavit.

While KPX signed Transgroup's alleged bill of lading/airbill on the shipment date, April 22, 2003, the driver picking up the shipment for Transgroup did not sign the Transgroup bill of lading/airbill until April 28, 2003, when he delivered the load to Benchmark Express for final delivery of the goods to the purchaser, Cobra Scooters. *Id.* at Ex. C.) At that time, it was noted that the skids had "broke down" and "missing 23." *Id.* The document the driver signed was not the same document signed by KPX because the information in the latter was typed, *id.*, as compared to the former, which was hand-written, *id.* at Ex. A.

The delivery copy of Transgroup's bill of lading/airbill reflects that there were 23 boxes missing. KPX asserts that there were 26 boxes missing, and Transgroup does not object to this assertion. (KPX SOF at Ex. A: Kanko Affidavit at 11-12); (Transgroup's Response, SOF at 17 (no objection to KPX SOF that 26 cartons were missing)); but see (Transgroup SOF at ¶ 16).

**PLAINTIFF'S FEDERAL CAUSE OF ACTION: 49 U.S.C. § 14704(A)(2).**

This Court's subject matter jurisdiction hinges on provisions in 49 U.S.C. § 14704(a) that creates a private cause of action for violations of the ICA, Motor Carrier provisions. Plaintiff alleges the following: 1) Transgroup fails to meet requirements for exemption from full liability provisions of 49 U.S.C. § 14706, yet acts as an exempt airfreight carrier for the purpose of using the airlines' $.50 per lb. limitation to evade full motor carrier liability, and 2) Paragraph 12 of Transgroup's alleged bill of lading/airbill contains provisions that violate federal law, such as: (a) Paragraph 12.A violates 49 U.S.C. § 13710(a)(3)(B) by requiring overcharge claims to be filed within 90 days of acceptance of a shipment instead of 180 days; (b) Paragraph 12.E which prohibits offsetting claims against Transgroup's freight charges is contrary to the repeal

- 5 -

of 49 U.S.C. § 10741; (c) Paragraph 12.F violates 49 U.S.C. § 14706(e)(1) by requiring suites to be filed within one year of disallowance in lieu of the Carmack Amendment's two year limitation, and (d) Paragraph 12.G and H require claims to be filed within 90 days of receipt of goods in violation of 49 U.S.C. 14706(e)(1), which prohibits a carrier from establishing a time limit less than nine months from delivery for filing claims for loss or damage.

Plaintiff seeks damages for these violations, an injunction against Transgroup from continued operations, and attorney fees pursuant to 49 U.S.C. 14704(a)(2) and (e).

Transgroup correctly points out that Plaintiff's Complaint alleging its private cause of action pursuant to 49 U.S.C. § 14704 for violations of the ICA does not include the challenges to the provisions contained in paragraph 12 of Transgroup's bill of lading/airbill that are raised for the first time in the Motion for Summary Judgment. Also missing from Plaintiff's Complaint is the request made in Plaintiff's Motion for Summary Judgment for injunctive relief. The Complaint does, however, charge that Transgroup violates the ICA by improperly operating under the guise of an air freight forwarder, as is evidenced by the issuance of "airbills" in lieu of motor carrier or freight forwarders bills of lading or receipts as required by 49 U.S.C. § 14706. (Complaint at 6.) Accordingly, the only issue considered by this Court is whether or not there is a private cause of action, pursuant to 49 U.S.C. 14704(a)(2), for KPX to bring a damage claim against Transgroup for its use of an airbill to avoid the requirements of section 14706, without meeting the requisites of 49 U.S.C. § 13506(8).

**A. Is there a Private Cause of Action against Transgroup for the Improper Use of an Airbill Instead of a Bill of Lading?**

The seminal case considering private causes of action pursuant to 49 U.S.C. 14704(a)(2) is *Owner-Operator Driver's Ass'n v. New Prime, Inc.,* 192 F.3d 778 (8th Cir. 1999). Owner-operators brought suit against motor carriers because the lease agreements used by the motor carriers violated Truth-in-Leasing regulations. The court held that a private right of action exists under 49 U.S.C. § 14704(a)(1) to bring a civil action for injunctive relief for violations of sections of the Motor Carrier Act dealing specifically with motor carrier leasing, and section

14704(a)(2), which provides that a carrier is liable for damages sustained by a person as a result of an act or omission of a carrier in violation of that part of the Act.

The 8th Circuit considered the ICC Termination Act of 1995 (ICCTA), which eliminated the Interstate Commerce Commission (ICC) as the agency responsible for the comprehensive regulation and licensing of motor carriers. "Congress intended that the Termination Act substantially deregulate rail and motor carrier transportation." *Id.* at 781. Congress expressly addressed the administrative system provided by the ICC for dispute resolution. It did not believe that the Department of Transportation (DOT) should allocate scarce resources to resolving what are essentially private disputes and specifically directed that DOT should not continue the dispute resolution functions established by the ICC. *Id.* (citing H.R.Rep. No. 104-311, at 87-88 (1995), *reprinted in* 1995-2 U.S.C.C.A.N. 793, 799-800). The bill provided for private parties to bring actions in court to enforce provisions of the Motor Carrier Act . . . to "permit these private, commercial disputes to be resolved the way that all other commercial disputes are resolved--by the parties." *Id.* "Consistent with this explanation, the Committee described § 14704 of the House Bill as 'provid[ing] for private enforcement of the provisions of the Motor Carrier Act in court. This expands the current law which only permits complaints brought under the Act to be brought before the ICC.'" *Id.* (citing H.R.Rep. No. 104-311, at 120-121; 1995-2 U.S.C.C.A.N. at 832-33).

In *New Prime*, the owner-operators sought to enforce Truth-in Leasing regulations in court, and the motor carriers argued for the prior regimen of exclusive administrative remedies. The court held that the Secretary of the Federal Highway Administration (FHWA) did not have exclusive jurisdiction to resolve private disputes over the Truth-in-Leasing regulations. *Id.* at 783 (*comparing,* 49 U.S.C. § 14701(b) (person may file a complaint with the Secretary or Board about a violation by a carrier of this part) and 49 U.S.C. §14704(2) (a carrier is liable for damages sustained by a person as a result of an act or omission of that carrier or broker)). The court analyzed the same provisions of section 14704(a) at issue in the case before this Court.

The eighth circuit court spoke definitively. The first sentence in Section 14704(a)(1) only authorizes private suits to enforce FHWA orders, not agency regulations. *Id.* at 783. The

second sentence in section (a)(1) provides that a private party "may bring a civil action for injunctive relief for violations of § 14102," the section of the Motor Carrier Act that deals specifically with motor carrier leasing. Though this sentence refers only to violations of the statute, it must also include violations of FHWA's implementing regulations because section 14102 contains no mandates or prohibitions but simply authorizes the Secretary to adopt leasing requirements. It would be impossible for a carrier to violate the statute other than by violating rules or regulations promulgated under the statute. The court rejected the argument that this second provision in subsection (1)(a) was limited to orders based on the plain language of the provision and because it would make little practical sense– "a party suing to enforce an agency order is unlikely to need relief beyond enforcement of the order." *Id.* at 784. The court allowed the owner-operators' claims for injunctive relief against the carriers.

Important to the case before this Court, the eighth circuit appellate court also allowed the owner-operators' damage claims pursuant to section 14704(a)(2), which provides that "[a] carrier ... is liable for damages sustained by a person as a result of an act or omission of that carrier ... in violation of this part." Like Transgroup, the carrier in *New Prime* argued that § 14704(a)(2) must be read with § 14704(a)(1)'s limitation to enforce only agency orders. The court rejected the carrier's argument and held that the two subsections are not interrelated. The court explained that they are separate parts of § 14704(a), which is entitled, "In General." "Moreover, a review of § 14704 in the two bills that were sent to conference, H.R. 2539 and S. 1396, reveals that the Conference Committee drafters reorganized this section in the final bill--the enforcement of agency orders section that is now § 14704(a)(1) and the damage remedy that is now § 14704(a)(2) were not previously linked." *Id.* at 784.

Confessing "to being rather mystified by the inconsistent language used in the Termination Act's various enforcement provisions . . .," the court nevertheless held that "the most logical reading of the language of § 14704(a)(2) is that it authorizes private parties to sue for damages for carrier conduct "in violation of [regulations promulgated under] this part." *Id.* at 785. "And that interpretation is certainly reinforced by the legislative history of § 14704(a)(2)." *Id.* (referring to H.R. Conf. Rep. No. 104-422 at 221-22, *reprinted in* 1995-2

U.S.C.C.A.N. at 906-07 (stating that § 14704(a)(2) "provides for private enforcement of the provisions of the Motor Carrier Act in court.... The ability to seek injunctive relief for motor carrier leasing ... violations is in addition to and does not in any way preclude the right to bring civil actions for damages for such violations.") "In construing this inconsistently drafted statute, it is appropriate to use its legislative history to confirm the most plausible construction of a subsection's plain language." *Id.* (citing *Wisconsin Public Intervenor v. Mortier*, 501 U.S. 597, 610 n. 4 (1991)).

The Eighth Circuit Court of Appeals concluded that 49 U.S.C. § 14704(a) authorizes private actions for injunctive relief and damages to remedy violations of the Motor Carrier Act and its implementing regulations.

In a recent case, the Ninth Circuit Court of Appeals accepted the reasoning of the eighth circuit. *Rivas v. Rail Delivery Service, Inc.*, 2005 WL 2159056, at *3 (9th Cir. September 8, 2005). The court held that the plaintiff lacked standing to bring its claim because the alleged violations did not cause the plaintiff any financial injury.[6] *Rivas v. Rail Delivery Service, Inc.*, 2005 WL 2159056, at *3 (9th Cir. September 8, 2005). Additionally, the court found that the private right of action under 14704(a) alters motor carriers' substantive rights by expanding the class of plaintiffs eligible to bring claims against them and 14704(a) may not be applied retroactively to agreements or conduct completed before the effective date of the ICCTA. *Id.* at *4. For both these reasons, the court granted summary judgment for the carrier in *Rivas*.

Here, the Plaintiff has standing to bring a private cause of action against Transgroup because KPX's damages result directly from the challenged bill of lading/airbill, which Plaintiff alleges violates 49 U.S.C. 14706 (1997), which provides:

> (1) Motor carriers and freight forwarders.--A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the

---

[6] Here, Plaintiff's alleged paragraph 12 violations fail for lack of standing as well as for Plaintiff's failure to charge the violations in the Complaint because Plaintiff fails to allege any injury resulted from them.

receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . Failure to issue a receipt or bill of lading does not affect the liability of a carrier. A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

(2) Freight forwarder.--A freight forwarder is both the receiving and delivering carrier. When a freight forwarder provides service and uses a motor carrier . . . to receive property from a consignor, the motor carrier may execute the bill of lading or shipping receipt for the freight forwarder with its consent. With the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt.

(b) Apportionment.--The carrier issuing the receipt or bill of lading under subsection (a) of this section or delivering the property for which the receipt or bill of lading was issued is entitled to recover from the carrier over whose line or route the loss or injury occurred the amount required to be paid to the owners of the property, as evidenced by a receipt, judgment, or transcript, and the amount of its expenses reasonably incurred in defending a civil action brought by that person.

Because KPX's Carmack claim attacking Transgroup's bill of lading, brought pursuant to § 14706, is dismissed for lack of jurisdiction because it is less than $10,000.00, the only claim that remains is KPX's charge that Transgroup issued an airbill, without satisfying the requisites in 49 U.S.C. § 13506(8) for such an exception to the mandates of § 14706.

"The purpose of the $10,000.00 amount in controversy limitation to jurisdiction is to prevent the abuse of the federal judicial process by overloading the federal courts with small freight claims." *Pillsbury Company v. Atchison, Topeka and Santa Fe Railway Company*, 548 F. Supp. 28, 29-30 (Kansas 1982). The jurisdictional amount in controversy limitation does not, however, apply to any of KPX's claims other than those brought pursuant to 49 U.S.C. § 14706. *cf., Old Dominion Freight Line v. Allou Distributors, Inc.*, 86 F. Supp. 2d 92, 93 (E.D. N.Y. 2000). It does not prevent KPX from seeking relief for violations of other provisions of the Interstate Commerce Act, Part B, which governs motor carriers: 49 U.S.C. § 13101 *et seq.* Section 14704(a)(2) provides a private right of action for KPX to sue Transgroup for any damages related to the issuance of the airbill without meeting the requirements for any such motor carrier exemptions provided in 49 U.S.C. § 13506(8).

This is the violation alleged in Count III of KPX's Complaint, upon which summary judgment is granted in its favor. (Complaint at XXVII, XXVIII, XXIX (1)-(2), XXX.) KPX argues that the deceit in this case, Transgroup's issuance of an airbill containing a $.50 per lb. limitation on loss, resulted in losses to KPX calculated at $25 per lb., the limitation amount agreed to in the Road-e-o bill of lading or $7,946.00. *See* (Plaintiff's MSJ at 11, 13; Complaint at p 6-7.)

**B.  Is the Straight Bill of Lading Prepared by Road-e-o or the Document Prepared by Transgroup the Contract of Carriage for the KPX Shipment of scooters?**

KPX argues that the document Transgroup asserts is its bill of lading is instead an improper attempt to issue an airbill. Transportation of airfreight is exempt from motor carrier regulations if it meets the conditions specified in 49 U.S.C. § 13506(8)(B) or (C), which are: transportation of property by motor vehicle as a part of a continuous movement which, prior or subsequent to such part of the continuous movement, has been or will be transported by an air carrier . . . ; or transportation of property by motor vehicle in lieu of transportation by aircraft because of adverse weather conditions or mechanical failure of the aircraft or other causes due to circumstances beyond the control of the carrier or shipper. It is undisputed that the document issued by Transgroup fails to meet these specifications. KPX argues that, therefore, Transgroup is not exempt from the requirement in section 14706 to issue a bill of lading and its attempt to superimpose its airbill over the Road-e-o bill of lading violates this provision of the Motor Carrier statute.

Transgroup argues that the document challenged by the Plaintiff is NOT an airbill, but is a bill of lading that fully complies with 49 U.S.C. § 14706(c) provisions for limiting its liability to $.50 per pound.

Transgroup argues that its failure to caption the document as a bill of lading and to instead repeatedly use the term airbill within the body of the document is of no significance because 49 U.S.C. § 14706 does not require a bill of lading to be so titled, and the statute also allows for a receipt or invoice to be provided in lieu of a bill of lading. (Transgroup MSJ at 6

n. 4 (citing *Insurance Comp. of North America v. NNR Aircargo Svc., Inc.,* 201 F.3d 1111, 1113 (9th Cir. 20000) (upholding and enforcing liability limitations found in an invoice)).

*NNR Aircargo* involved a manufacture and distributor of sporting goods that contracted with NNR on 47 separate occasions for transportation services, including freight forwarding, brokering and transportation, related to the importation of golf balls. On the last occasion, a truck cargo was stolen and two weeks after the theft the distributor received *an invoice* for NNR's services containing a limitation on the carrier's liability. The court found its analysis with respect to *bills of lading to be most instructive because, like invoices, they serve the dual purpose of billing customers and stipulating terms and conditions of an agreement. Id.* at 1114.

The Ninth Circuit Court of Appeals wrote: "In ascertaining the volume of transactions necessary to presume a familiarity with the terms contained in a bill of lading, we have found a course of dealing based on receipt of three to four bills of lading with identical limitation of liability terms." *Id.* (citing *Royal Ins. Co. v. Sea-Land Serv. Inc.*, 50 F.3d 713, 727 (9th Cir. 1995)). "Consistent with this reasoning," the court found that "47 identical invoices sent by NNR over a period of three years put the manufacture on notice of the terms and conditions contained in them." *Id.* at 1114.

A course of dealing is "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." An inference of the parties' common understanding that is based upon a prior course of dealing is a question of fact. *Id.* 1113 (citing *In re CFLC, Inc.* 166 F.3d 1012, 1017 (9th Cir. 1999)).

Here, Transgroup argues that there was a course of conduct between it and Road-e-o because the two had established a business relationship for six to seven months prior to the KPX shipment. The relationship involved daily communication and daily placement of shipping orders. In that time frame, "Road-e-o had utilized Transgroup, as a freight forwarder and/or carrier, on dozens, if not hundreds of occasions. (Transgroup SOF at Wickstrom Affidavit.)

On those occasions, Road-e-o always prepared the bill of lading, and "the drivers always signed [Road-e-o's] bill of lading and returned its copy. No driver had ever objected to receiving freight on [Road-e-o's] bill of lading." (KPX SOF at Nicolls Affidavit.) Road-e-o always used the same bill of lading, which clearly limits the carrier's liability to $25 per pound. *Id.* Also on those occasions, Transgroup used its bill of lading that included its limitation of liability language as found in the bill of lading paperwork involved in the instant matter." (Transgroup SOF at Wickstrom Affidavit.)

Transgroup had never informed Road-e-o that they were operating under a substituted bill of lading, never sent a copy of the Transgroup airbill to Road-e-o, and never informed Road-e-o or any of its customers that Transgroup's liability was limited to $.50 per pound. *Id. The first time Road-e-o received a copy of Transgroup's bill of lading/airbill was on declination of KPX's claim.* (KPX SOF at Nicolls Affidavit.) Transgroup does not dispute this.

The Court finds that the course of dealing between Transgroup and Road-e-o, put Transgroup on notice of the terms and conditions, including liability, contained in the Road-e-o bill of lading because Transgroup's carriers received copies of the Road-e-o bill of lading in every instance. Conversely, Road-e-o had no idea the Transgroup bill of lading/airbill existed and had no idea of the terms and conditions contained in the Transgroup document.

In the KPX transaction, Transgroup knew Road-e-o had prepared the bill of lading[7] and that Road-e-o and KPX intended its terms and conditions to apply to the KPX shipment because Road-e-o sent a memo to Transgroup on April 22, 2003 that it had completed the bill of lading, and it and the scooters were waiting at KPX for the carrier. (KPX SOF at Ex. K.) Conversely,

---

[7] It is common for the carrier to prepare the bill of lading and present it to the shipper. *Union Pacific R.R. v. Greentree Transportation Trucking*, 293 F.3d 120, 124 (3rd Cir. 2002); *see also*: 49 U.S.C. § 14706(1) ("carrier . . . shall issue a receipt or bill of lading for property it receives for transportation. . ..") Under such circumstances, the bill of lading is a contract of adhesion and construed against the carrier. *All Pacific Trading Inc., v. Vessel M/V Hanjin Yosu*, 7 F.3d 1427, 1341 (9th Cir. 1993). Conversely, when the shipper prepares the bill of lading, the document is construed against it. *Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc.*, 331 F.3d 834, 839-40 (11th Cir. 2003). (explaining a shipper does not prepare a bill of lading by filling in blanks on a bill of lading prepared by the carrier.)

neither KPX nor Road-e-o knew that Transgroup intended to use a different bill of lading. While KPX signed the document that Transgroup asserts is the bill of lading covering the scooter shipment, this assertion was not evident from either the face of the document or the circumstances surrounding its signing.

First, Road-e-o prepared a straight through, non-negotiable, bill of lading, which was designed to govern the entire transportation and fix the terms and conditions of transportation for all participating carriers. See *Union Pacific Railroad Company v. Greentree Transportation Trucking*, 293 F.3d 120, 125 (3rd Cir. 2002) (explaining that under a through bill of lading a second, bill of lading issued by a connecting carrier does not alter the terms of the original bill of lading unless the connecting carrier received consideration for its bill of lading in addition to that given for the bill of lading issued by the initiating carrier). The very purpose of the Carmack Amendment is to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods, by permitting a shipper to hold either the initiating carrier or delivering carrier liable for damages to its goods, regardless of which carrier actually caused the damage. *Id.* at 124 (citations omitted). The carrier held liable may then recover from a connecting carrier for damages that occur on the connecting carrier's line. *Id.*

Second, KPX gave the Road-e-o bill of lading to the truck driver sent by Transgroup to pick up the scooters, and he had signed it. It, therefore, made no sense that the truck driver would present another bill of lading to KPX. Transgroup's document was labeled "airbill," but KPX knew that the scooters were not being shipped by air. The signature block where KPX signed certifies: "the shipment does not contain any unauthorized explosives, destructive devices, or hazardous materials and that the shipper consents to a search of this cargo." (Transgroup SOF at Ex. A.)

There is no evidence to suggest that KPX knew the Transgroup document tendered by the truck driver was the bill of lading covering the scooter shipment. The Court finds that under the circumstances, no reasonable person would have understood the document to be the bill of lading for the scooter shipment. The Court finds that the Straight Bill of Lading prepared by

Road-e-o, signed by KPX and the truck driver sent by Transgroup, is the contract of carriage covering the scooter shipment. Accordingly, Transgroup's liability is limited to $25.00 per pound, making Transgroup liable for the full value of the undelivered shipment.

"Transportation contracts are governed by the Carmack Amendment to the exclusion of state law remedies." (KPX Response at 10.) A bill of lading is the basic transportation contract between the shipper and the carrier. *Southern Pacific Transportation Co., v. Commercial Metals Co.*,1 456 U.S. 336, 342 (1982). To this extent, under the Carmack Amendment the Plaintiffs claim is for breach of contract. The remedies Plaintiff seeks are those provided for in the Carmack Amendment. "Plaintiff seeks only restitution for the invoice value of the shipment stolen in transit while in Defendant's custody and control." (KPX Response at 10.) Consequently, Plaintiff's common-law breach of contract claim is preempted by the Carmack Amendment, (Complaint at PP 19-23), and must be dismissed.

This, however, has no substantive affect on the Court's disposition of this matter in favor of KPX because damages, pursuant to 49 U.S.C. 14704(a)(2), for the loss resulting from Transgroup's issuance of the airbill are measured at $25 per pound for the lost scooters, which is the same as if calculated as a Carmack award.

**C.    Did Transgroup's Alleged Bill of Lading Give KPX a Fair Opportunity to Choose Between Levels of Liability?**

It is of some consequence that the general rule under the Carmack Amendment has always been that a carrier is liable for the actual value of the lost or damaged property. *Emerson Electric Supply Company v. Estes Express Lines Corp.*, 324 F. Supp. 2d 713, (Penn. 2004) (citing *Rhner Gehrig Co. Inc. v. Tri-State Motor Transit*, 950 F.2d 1079, 1083 (5th Cir. 1992) (explaining that the Carmack Amendment expresses a public policy against limitation of liability by a carrier). Any exception to the Carmack Amendment's public policy for full carrier liability must be construed narrowly. *Id.*

To limit liability, the carrier must comply with 49 U.S.C. 14706, as follows:

(c) Special rules.–
(1) Motor carriers.--
(A) Shipper waiver.--Subject to the provisions of subparagraph (B), a carrier . . . may, . . . establish rates for the transportation of property (other than household

> goods . . . ) under which the liability of the carrier for such property is limited to a value established by written or electronic declaration of the shipper or by written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation.
> (B) Carrier notification.--If the motor carrier is not required to file its tariff with the Board, it shall provide under section 13710(a)(1) [information relating to basis of rate] to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based. The copy provided by the carrier shall clearly state the dates of applicability of the rate, classification, rules, or practices.

The carrier bears a substantial burden when limiting liability to less than full value. *Bio-Lab, Inc. v. Pony Express Courier Corporation*, 911 F.2d 1580, 1582 (11th Cir. 1990). The carrier may limit its liability to a "value established by written or electronic declaration by the shipper if the value would be reasonable under the circumstances surrounding the transportation." 49 U.S.C. § 14706(C)(1)(A). The carrier must provide the Plaintiff with "reasonable notice of the limited liability and a fair opportunity to purchase higher liability. *Kesel v. United Parcel Service Inc.*, 339 F.3d 849, 852 (9th Cir. 2003).

In *Bio-Lab*, the court considered a bill of lading where the shipper's declaration of the full value of the goods on the face of the document was undone by an inconspicuous limitation of liability written on the back of the document. The court explained that a carrier cannot limit liability by implication. "There must be an absolute, deliberate and well-informed choice by the shipper." *Bio-Lab, Inc.*, 811 F.2d at 1582-82. Under such circumstances, the court explained that it would not find the latter provision which was not as clearly designated as the former and was contrary to the former provision, to operate as the agreement between the parties "unless it is reasonably clear that the shipper was specifically aware of that [latter] provision." *Id.* at 1583. Under such circumstances, it was not enough that the shipper should have or may have read the back of the document. The carrier altered the bill of lading that had been used by the parties over an extended course of dealings and failed to inform the shipper of its change to limit its liability. Finding such a unilateral after-the-fact change had no legal effect on the transaction, the court found the carrier liable for the full value of damages.

Here, the two liability provisions do not appear in the same document, but appear in two documents signed simultaneously one after the other. Accordingly, the logic in *Bio-Lab*

applies. Like the carrier in *Bio-Lab*, Transgroup altered the bill of lading that had been used by the parties over an extended course of dealing and failed to inform KPX/Road-e-o of the change.

This unilateral, after the fact, change had no legal affect on the transaction. Transgroup remains liable under the bill of lading prepared by Road-e-o/KPX, signed by the truck driver sent by Transgroup to pick up the shipment of scooters.

This is the only possible finding given the requirement that the shipper must be given a fair opportunity to choose between the regular rate and a rate reflecting a higher level of liability. There must be some evidence of an agreement between the parties. See *Camar Corp. v. Preston Trucking*, 221 F.3d 271, 276 (discussing inadequacy of bill of lading). Under the circumstances surrounding KPX's signing of Transgroup's document, the existence on that document of a box titled "Full Value," left blank by KPX, does not constitute a sufficient agreement to limit liability to $.50 per pound. This is especially because KPX had just tendered and Transgroup's driver had just signed a Straight Bill of Lading specifying that liability would be $25.00 per pound.

Both the contract and Carmack claim being dismissed, the Court provides the analysis contained in this section only because it relates to KPX's claim for damages, pursuant to 49 U.S.C. § 14704(a)(2), which measures KPX's financial losses resulting from Transgroup's issuance of the airbill to sidestep liability under a bill of lading, as the amount specified in the bill of lading prepared by Road-e-o.

**D.     Motion for Summary Judgment**

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to material fact." Fed.R.Civ.P. 56(c). In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986).

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there

be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is any factual dispute that might effect the outcome of the case under the governing substantive law. *Id.* at 248. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the non-moving party. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986). The moving party is under no obligation to negate or disprove matters on which the non-moving party bears the burden of proof at trial. *Id.* at 325. Rather, the moving party need only demonstrate that there is an absence of evidence to support the non-moving party's case. *Id.*

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Rule 56(e), Fed.R.Civ.P.). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth specific facts demonstrating a genuine issue for trial. *Id.*; Fed.R.Civ. P. 56(e).

The party with the burden of proof at trial also bears that same burden when making or opposing a motion for summary judgment. *Celotex*, 477 U.S. at 322. So to prevail, "[t]he party moving for summary judgment must offer evidence sufficient to support a finding upon every element of his claim for relief, except those elements admitted by his adversary." *Lockwood v. Wolf Corporation*, 629 F.2d 603, 611 (9th Cir. 1980).

Motions for summary judgment should be viewed "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327

(citations omitted). Accordingly, the rules governing motions for summary judgment should be enforced with regard not just for rights of the nonmovant, but also for the rights of the party contending that there exists no genuine issue of material fact. *Id.*

The Judge's role on a motion for summary judgment is not to determine the truth of the matter or to weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252. The inquiry mirrors the standard for a directed verdict: whether the evidence reveals a factual disagreement requiring submission of the case to a jury or whether evidence is so one sided that one party must prevail as a matter of law.

The Court finds that the standards for summary judgment are met, and Plaintiff prevails as a matter of law.

**E.     Is Plaintiff Entitled to Attorney Fees?**

Title 49, United States Code, section 14704, subsection (e), provides that "[t]he district court shall award a reasonable attorney's fee under this section. The district court shall tax and collect that fee as part of the costs of the action." Conceding this, Defendant's only argument against attorney fees is that Plaintiff has no private cause of action under 49 U.S.C. § 14704. Having rejected the argument and found such a cause of action to exist pursuant to § 14704 for damages related to Transgroup's issuance of the airbill, without meeting the requirements for the motor carrier exemptions provided in 49 U.S.C. § 13506(8), Defendant Transgroup's argument against an award of attorney fees fails. The Plaintiff's attorney fees shall be taxed and collected in this matter as part of the costs of the action.

**Accordingly,**

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (document 26) is GRANTED as to Count III.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (document 28) is GRANTED IN PART AND DENIED IN PART. Counts I and II are dismissed.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (document 39) the Plaintiff's Reply brief because it exceeds 11 pages is DENIED. On July 29, 2005, this Court granted the Plaintiff's Motion for Leave to File Amended Reply. The Amended Reply was filed July 29, 2005. The Motion to Amend/Correct Reply (document 43) is DENIED AS MOOT.

**IT IS FURTHER ORDERED** that within 10 days of the filing date of this Order, the parties shall file a status report regarding disposition of the Third-Party Complaint filed by Transgroup against Road-e-o and Road-e-o's Counterclaim against Transgroup.

**IT IS FURTHER ORDERED** that pursuant to Fed. R. Civ. P. 54b, the Clerk of the Court shall enter an Amended Judgment for KPX against Transgroup in the amount of $7,946.00. Plaintiff's attorney fees shall be taxed and collected in this matter as part of the costs of the action.

DATED this 21st day of February, 2006.

David C. Bury
United States District Judge